900 A.2d 208

## STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

v.

## Richard DeHAAN.

## No. 93, Sept. Term, 2005.

Court of Appeals of Maryland.

June 5, 2006.

164

Michael J. Budow (Anne K. Howard of Budow and Noble, P.C., of Bethesda, MD), on brief, for petitioner.

Francis J. Ford (Francis J. Ford, P.A., of Bethesda, MD), on brief, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This case concerns the interpretation of Maryland Code (1997, 2006 Rep. Vol.), § 19–509 of the Insurance Article [1] (the State's uninsured motorist statute) and the coverage due to an insured under an automobile's uninsured motorist section of his insurance policy. Four questions are presented for our review:

1. "Did the courts below err in concluding that Richard DeHaan['s] injuries arose out of the *use* of an automobile?"

2. "Did the courts below err in concluding that Richard DeHaan was entitled to underinsured motorist benefits pursuant to the terms of the automobile insurance policy issued to him by State Farm Mutual Automobile Insurance Company in light of the fact that the injuries and damages claimed by Mr. DeHaan arise solely from a gunshot wound?"

3. "Did the courts below err in concluding that simply by sitting in the driver's seat of a vehicle a person qualifies

---

1. Unless otherwise indicated, every statutory reference in this opinion is to the Insurance Article of the Maryland Code.

as an *operator* of the vehicle as that term is used in the Maryland Annotated Code, *Insurance Article* Section 19–509?"

4. "Did the courts below err in concluding that Mr. DeHaan's Blazer qualifies as an uninsured motor vehicle under the very same State Farm insurance policy that insures it and if not, did the courts below improperly find that the 'owned but not insured' exclusion in the uninsured motorist portion of the policy violates Maryland law?"

We hold that the injuries to respondent did not arise out of the use of the vehicle as contemplated under the uninsured motorist statute and the insurance policy at issue in the case at bar. Because our holding on the first two questions is dispositive of the case, we shall not address the third and fourth questions.

## I. Facts and Procedural History

On January 28, 2001, after attending a Super Bowl party, Richard DeHaan, respondent, stopped at the Westview Shell gas station in Baltimore County at approximately 11:15 p.m. He was driving his 1989 Chevrolet Blazer, which was insured under a State Farm Mutual Insurance Company's ("State Farm") policy. The policy provided for $10,000.00 coverage in Personal Injury Protection benefits (PIP) and $100,000.00 coverage in uninsured motorist benefits.

After arriving at the gas station, Mr. DeHaan turned off the vehicle, placed the keys on the driver's side floorboard and entered the convenience store portion of the Westview station to make a purchase. Upon returning to his vehicle, Mr. DeHaan noticed that there was an individual sitting in the driver's seat of the Blazer. Mr. DeHaan opened the driver's side door and asked the stranger "what are you doing?" His question was answered with gunfire from the intruder, who then started the vehicle and left the scene, stealing Mr. DeHaan's car and leaving him wounded at the gas station. After the shooting, Mr. DeHaan was taken to Maryland Shock Trauma Center. As a result of the incident, Mr. DeHaan suffered substantial injuries, incurred approximately

$70,000.00 in medical expenses, and was unable to work for about six months. The assailant, Mr. Ronald Neely, was later identified, arrested, and convicted of attempted murder.[2] Mr. Neely was incarcerated at the time this case was brought before the Circuit Court for Howard County.

Mr. DeHaan submitted two claims to State Farm. The first claim sought recovery under the PIP portion of the insurance policy and the second claim was based upon the uninsured motorist section of the same policy. State Farm denied both claims, alleging that they were not covered by the relevant policy provisions. Mr. DeHaan then filed a complaint with the Circuit Court for Howard County.

The trial court granted Mr. DeHaan's motion for summary judgment. It determined that the facts, agreed upon by the parties, supported Mr. DeHaan's claims under both the PIP and the uninsured motorist provisions of the insurance policy. Petitioner then paid Mr. DeHaan the amount covered under the PIP provision, but timely appealed the trial court's decision regarding the uninsured motorist claim. The Court of Special Appeals in an unreported opinion agreed[3] with the

---

2. Both parties refer to the theft of Mr. DeHaan's vehicle as a "carjacking." At oral argument Mr. DeHaan's counsel was asked whether the actions of the assailant met the requirements of criminal carjacking. Md.Code (2002), § 3–405 of the Criminal Law Article. That section provides: "(b) ... (1) An individual may not take unauthorized possession or control of a motor vehicle from another individual who *actually possesses* the motor vehicle, by force or violence, or by putting that individual in fear through intimidation or threat of force or violence." *Id.* (emphasis added). The Court of Special Appeals has stated that actual possession does not require that the driver be inside the vehicle at the time of the carjacking. *Price v. State*, 111 Md.App. 487, 500, 681 A.2d 1206, 1212 (1996), *Mobley v. State*, 111 Md.App. 446, 455, 681 A.2d 1186, 1190, *cert denied*, 344 Md. 117, 685 A.2d 452 (1996). Although, it is possible that the incident may qualify under the statute upon proper factual findings by a trial court or jury, that determination has not been made and, therefore, we will not refer to this incident as a carjacking—but consider it as a shooting during the process of a theft.

3. Although the Court of Special Appeals agreed with the trial court on the substance of its findings, the intermediate court vacated the judgment and remanded to the circuit court because the trial court failed to issue an order in accordance with Maryland Rule 2–601, which re-

trial court and State Farm filed a petition for writ of certiorari on October 6, 2005. We granted certiorari on December 5, 2005. *State Farm v. Dehaan,* 390 Md. 90, 887 A.2d 655 (2005).

## II.  Standard of Review

■ Judge Greene, writing for the Court, recently described the standard of review in respect to the grant of a summary judgment motion by a trial court where, as in the case *sub judice,* the parties have agreed that there are no disputed issues of material fact:

"As stated in Md. Rule 2–501(f), '[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.' Whether summary judgment was properly granted is a question of law, and we must determine whether the trial court was legally correct in doing so. *Goodwich v. Sinai Hosp. of Baltimore,* 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996). In the present case, the parties agree that there are no factual disputes. Rather, the application of case law and the interpretation of a particular section of the Insurance Article were the only questions before the trial court, and they are the only questions now before us. As such, it is clear that our review is *de novo. See Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002) (noting that where the order of the trial court involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review)."
*Johnson v. Nationwide Mut. Ins. Co.,* 388 Md. 82, 86–87, 878 A.2d 615, 617–18 (2005). Because the parties have agreed upon a stipulated statement of facts, we will review the circuit court's decision *de novo* to ascertain whether it was legally correct.

---

quires that judgments must be entered in a separate document from the memorandum opinion.

### III. Discussion

In order to determine whether Mr. DeHaan is entitled to collect under the uninsured motorist provision of his policy we must interpret Maryland Code (1997, 2006 Rep. Vol.), § 19–509 of the Insurance Article. Our interpretation must conform to the well-settled principles of statutory construction:

"As we have so often stated, 'the cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). To begin with, we must consider the plain language of the statute. As noted in *Chesapeake & Potomac Telephone Co. v. Director of Finance for Mayor and City Council of Baltimore,* 343 Md. 567, 683 A.2d 512 (1996), 'we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also.' *Chesapeake & Potomac Telephone,* 343 Md. at 578, 683 A.2d at 517; *see also Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1206–07 ('If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.'). Moreover, '[w]here the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language.' " *Chesapeake & Potomac Telephone,* 343 Md. at 579, 683 A.2d at 517 (quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993)).

*Johnson,* 388 Md. at 88–89, 878 A.2d at 618–19. Furthermore, Judge Greene stated for the Court:

"Our goal in interpreting statutes is to give them their 'most reasonable interpretation, in accord with logic and common sense, and to avoid a construction not otherwise evident by the words actually used.' *Greco v. State,* 347 Md. 423, 429, 701 A.2d 419, 422 (1997). We will avoid constructions that are 'illogical, unreasonable, or inconsistent with common

sense.' *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994). Moreover, we will not engage in a 'forced or subtle interpretation in an attempt to extend or limit the statute's meaning.' *'Nesbit v. GEICO,* 382 Md. 65, 76, 854 A.2d 879, 885 (2004) (quoting *Taylor v. NationsBank,* 365 Md. 166, 181, 776 A.2d 645, 654 (2001)).'"

*Id.* at 89, 878 A.2d at 619.

At the heart of this appeal lies our interpretation of two specific subsections of § 19–509. Subsection (a)(1) defines 'uninsured motor vehicle' as a motor vehicle, 'the ownership, maintenance, or *use* of which has resulted in the bodily injury or death of an insured ....' § 19–509(a)(1) (emphasis added). Subsection (c)(1) provides that the insured is entitled to recover "because of bodily injuries sustained in a motor vehicle accident arising out of the ownership, maintenance, or *use of the uninsured motor vehicle.*" § 19–509(c)(1) (emphasis added). The statute does not define the word 'use.' The fact that word is not defined subjects it to the possibility of different interpretations. We, therefore, look beyond the different meanings of the words in order to determine the intent of the legislature in enacting this section. We will first analyze the history of the uninsured motorists statute, then evaluate the context of the words as interpreted within the entire section and, finally, we will focus primarily on our interpretation of this language.

### A. Maryland's Uninsured Motorist Statute

The Legislature first enacted the uninsured motorist statute as Chapter 73 of the Acts of 1972. This section was part of a large bill which also created the Maryland Automobile Insurance Fund (MAIF), the bill provided:

*"(c) In addition to any other coverage required by this subtitle, every policy of motor vehicle liability insurance issued, sold, or delivered in this State after January 1, 1973 shall MAY contain coverage, in at least the amounts required under Section 7–101 of Article 66½ of the Annotated Code of Maryland (1970 Replacement Volume and 1972 Supplement), for damages which the insured is entitled to*

*recover from the owner or operator of an uninsured motor vehicle because of bodily injuries sustained in an accident arising out of the ownership, maintenance, **or use of such uninsured motor vehicle.***" (Bolding added for emphasis.)

The statute was later amended and codified as Maryland Code (1957, 1972 Repl.Vol., 1978 Cum.Supp.), Art. 48A, § 541(c).

The enactment of this section complied with one of the recommendations made in a Report of the Special Committee on No–Fault Insurance dated January 31, 1972. The committee's recommendation stated: "To complement the first party coverage and to protect more fully a Maryland driver, the second bill requires the driver to carry uninsured motorist coverage in the event he suffers damage caused by an out-of-state driver not protected by liability insurance." This statute did not define the term "use" or explain the meaning of the sentence "an accident arising out of the ownership, maintenance, or use of such uninsured motor vehicle." § 541(c).

In 1981, the Legislature amended section 541 to include a definition of "uninsured motor vehicle." The amended section provided:

"(1) In this subsection 'uninsured motor vehicle' means a motor vehicle whose ownership, maintenance, or *use* has resulted in the bodily injury or death of an insured, and for which the sum of the limits of liability under all valid and collectible liability insurance policies, bonds, and securities applicable to the bodily injury or death is less than the amount of coverage provided to the insured under this subsection."

Md.Code (1957, 1979 Repl.Vol., 1985 Cum.Supp.), Art. 48A § 541(c) (emphasis added). Then in 1982 and 1985, the Legislature enacted additional amendments allowing insurance providers to exclude from coverage '[t]he named insured or members of his family residing in the household when occupying, or struck as a pedestrian by, an uninsured motor vehicle that is owned by the named insured or a member of his immediate family residing in his household . . . .' § 541(c)(2)(i).

.

Respondent asks us to hold that an injury suffered as a result of a gunshot from an insured vehicle, which is standing still and with the ignition off, arose out of the use of the vehicle. Such a holding would imply that in enacting the exclusion clause above, the Legislature intended to allow insurers to exclude only those injuries which occur as a result of an actual collision or accident in which an uninsured vehicle owned by the victim is the instrumentality of the harm, while forbidding the same insurer from excluding the insured from coverage for injuries not directly related to the actual operation of an uninsured motor vehicle owned by the victim.[4] Such interpretation would not be logical. Another more reasonable interpretation of the amendment is that the Legislature did not consider the entire uninsured motorist statute as one providing coverage from injuries *other than those incurred through the actual use of an uninsured motor vehicle,* meaning that the motor vehicle had to be the instrumentality that caused the harm and that vehicle had to be a vehicle, under

---

4. In the present case, although the vehicle was insured, if the vehicle had been the instrumentality of the injury, it may have been considered "uninsured" because the assailant was not an authorized "driver." The liability provision of the insurance policy defines insured, *inter alia,* as "any other *person* while using such a *car* if its use is within the scope of consent of *you* or *your* spouse . . . ."

Section 19–509(a) of the Insurance Code provides:

"(a) *'Uninsured motor vehicle' defined.*—In this section, 'uninsured motor vehicle' means a motor vehicle:

(1) the . . . *use* of which has resulted in the bodily injury or death of an insured; *and*

(2) for which the sum of the limits of liability under all valid and collectible liability insurance policies, bonds, and securities applicable to bodily injury or death:

(i) is less than the amount of coverage provided under this section; or

(ii) has been reduced by payment to other persons of claims arising from the same occurrence to an amount less than the amount of coverage provided under this section." (Emphasis added)

While it is possible that an insured's vehicle might qualify as an "uninsured motor vehicle" under subsection (2) because the liability coverage is less than that provided under the section, the insured must be able to show that the vehicle's *use* resulted in the injury in order to reach that prong. The conjunction "and" linking both subsections together requires such a result.

the circumstances, for which no sufficient liability insurance exists at the time of the incident.[5]

The next major revision of the section was codified in Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 541, in which the definition of "uninsured motor vehicle" remained substantively unaltered, but the coverage section was amended to state:

> "(2) In addition to any other coverage required by this subtitle, every policy of motor vehicle liability insurance issued, sold, or delivered in this State after July 1, 1975 shall contain coverage in at least the amounts required under Title 17 of the Transportation Article, for damages, subject to the policy limits, which:

(i) The insured is entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injuries sustained in an accident arising out of the ownership, maintenance, or *use* of such uninsured motor vehicle; . . . ." (Emphasis added).

Finally in 1997, Article 48A was recodified as the Insurance Article of the Maryland Code. The uninsured motorist section was reenacted without substantive changes and is now codified as Maryland Code (1997, 2006 Repl.Vol.), § 19–509 of the Insurance Article, which provides:

> "**§ 19–509. Uninsured motorist coverage—In general.**
>
> (a) ... In this section, 'uninsured motor vehicle' means a motor vehicle:
>
> > (1) the ownership, maintenance, or *use of which has resulted in the bodily injury or death of an insured;* and
>
> . . .
>
> (c) ... In addition to any other coverage required by this subtitle, each motor vehicle liability insurance policy issued, sold, or delivered in the State after July 1, 1975, shall

---

5. It is not disputed that Mr. DeHaan's automobile, the only automobile at issue in the case at bar, was a properly insured vehicle.

contain coverage for damages, subject to the policy limits, that:

(1) the insured is entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injuries sustained in a motor vehicle accident arising out of the ownership, maintenance, or *use of the uninsured motor vehicle;* and

. . .

(f) *Exclusions.*—An insurer may exclude from the uninsured motorist coverage required by this section benefits for:

(1) the named insured or a family member of the named insured who resides in the named insured's household for an injury that occurs when the named insured or family member is occupying or is struck as a pedestrian by an uninsured motor vehicle that is owned by the named insured or an immediate family member of the named insured who resides in the named insured's household . . . ." (Emphasis added.)

The history of the statute indicates several relevant concerns. First, the uninsured motorist section was enacted upon a recommendation to provide protection against uninsured drivers for injured Maryland residents who have the misfortune to be harmed by tortious acts, where the injury is caused by the instrumentality of an uninsured automobile, generally driven by the tortfeasor. From the amendments to the exclusion section we can reasonably infer that the Legislature did not intend to extend coverage under the uninsured motorist provision to situations where the vehicle is only incidentally related to the harm caused by intentional criminal acts.

The next step in our analysis is to interpret the language in question in light of the context of the entire section. Here, the interpretation of the exclusion section is important. That section specifically allows insurance companies to exclude from coverage injuries that the insured suffers as a result of an incident with an uninsured vehicle, which the insured owns.

§ 19–509(f)(1). There is no question that if the insured is struck by a vehicle owned by him or her, and the policy contains the permitted exclusion, the policy holder will not be able to recover. This is consistent with the purpose of the statute to protect victims from injury by a uninsured motor vehicle owned by others. The statute would have to be stood on its head to allow recovery for injuries incurred where the vehicle is only incidentally related to the injury, especially where it is standing still with the ignition off, but to bar recovery if the vehicle actually is moving and strikes the owner, i.e., is the direct instrumentality of the harm.

With this context in mind, we turn to the case law and its interpretation of this language, more specifically to answer whether injuries from the discharge of a handgun by an individual in the driver's seat of a standing vehicle with the ignition off, in the course of stealing the automobile, constitutes, for uninsured motorist coverage, a "use" or is "the result of a motor vehicle accident arising out of the ownership, maintenance, or *use* " of the vehicle.

Mr. DeHaan argues that the shooting constitutes a "use" under the statute because the assailant was in the vehicle and was in control of the vehicle at the time of the incident. Mr. DeHaan contends that the act of stealing the Blazer, by itself, was a "use" of the vehicle as evidenced by the fact that the assailant drove the vehicle away from the scene after the shooting. He states that, as a result, the assailant "had taken control of [Mr. DeHaan's] vehicle and was exercising use over it." Mr. DeHaan, however, fails to recognize that discharging a firearm does not have anything to do with the *use* of a vehicle as contemplated under the statute.

We have previously stated that "[t]he uninsured motorist statutory plan is remedial in nature and 'dictates a liberal construction in order to effectuate its purpose of assuring recovery for innocent victims of motor vehicle accidents.' *State Farm Mut. Auto. Ins. Co. v. Md. Auto. Ins. Fund,* 277 Md. 602, 605, 356 A.2d 560, 562 (1976)." *Clay v. Gov't Employees Ins. Co.,* 356 Md. 257, 265, 739 A.2d 5, 9–10 (1999).

Such liberal construction, however, "is not without limits. The words of the statute itself delineate the extent of the statute's reach." *Johnson*, 388 Md. at 95, 878 A.2d at 623.

This Court has never gone as far as respondent suggests when pointing to *Stevenson v. State Farm Indem. Co.*, 311 N.J.Super. 363, 709 A.2d 1359 (1998), where the Superior Court of New Jersey, Appellate Division, noted: "Courts must apply a liberal construction of the no-fault insurance scheme 'so as to effect the purpose thereof.' ... The legislators apparently sought to ensure the 'broadest coverage possible so long as an automobile was involved in that which happened.'" *Id.* at 372, 709 A.2d at 1362–63. *Stevenson* involved the interpretation of New Jersey's PIP coverage, not that state's uninsured motorist statute. Furthermore, although *Stevenson* dealt with two drivers being shot in the course of a carjacking, the victims were inside the vehicle at the time of the incident and the PIP statute provided for coverage to insured people who sustained injuries "while *occupying,* entering into, alighting from or using [an] automobile...." *Id.* at 366 n. 2, 709 A.2d at 1360 n. 2 (emphasis added).[6] This language of the New Jersey PIP statute, i.e., occupying, is absent from the Maryland uninsured motorist provision.

This Court interpreted the meaning of the language "arising out of the ownership, maintenance or use of the automobile" in *National Indemnity Co. v. Ewing*, 235 Md. 145, 200 A.2d 680 (1964). In that case a drunk driver lost control of his vehicle striking a telephone pole. During the accident the sole pas-

---

6. We should note that under New Jersey law, while PIP coverage would provide protection for intentional harm, UM coverage will only provide such coverage if the harm was unintentional from the perspective of the carjacker. *Grabowski v. Liberty Mut. Ins. Co.*, 345 N.J.Super. 241, 246, 784 A.2d 754, 757 (2001); *but see Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 315, 753 A.2d 533, 542–43 (2000) (determination of what constitutes an "accident," for purposes of accidental death and dismemberment coverage in an automobile liability policy, assessed from perspective of injured insured, not from tortfeasor's viewpoint). In addition, that state requires the injuries to arise out of the "use" of the vehicle, i.e., there must be a substantial nexus between the automobile and the injuries. *Id.*

senger of the vehicle was thrown onto a snow bank. About twenty-five minutes later, the driver was helping the passenger cross the road when they were both hit by another car. The Court recognized the issue to be one of first impression and looked at other states for guidance in interpreting the meaning of the "arising out of" language as it related to the use of a vehicle requirement under the policy. We determined that "it has generally been held that, while the words import and require a showing of causal relationship, recovery is not limited by the strict rules developed in relation to direct and proximate cause." *Id.* at 149, 200 A.2d at 682.

The Court in *Ewing* pointed to two cases from other states: *Schmidt v. Utils. Ins. Co.*, 353 Mo. 213, 182 S.W.2d 181 (1944) and *Merchants Co. v. Hartford Accident & Indem. Co.*, 187 Miss. 301, 188 So. 571 (1939). In *Schmidt*, a pedestrian had been injured when two blocks used to unload a truck were negligently left behind by the truck owner's employees. In that case the Missouri court found that the injuries arose out of the *use* of the truck. *Schmidt*, 353 Mo. at 223, 182 S.W.2d at 186. In *Merchants*, the injuries were caused by poles left on the road after a vehicle had been removed from a ditch. We quoted from the *Merchants* opinion, which stated:

" 'Our conclusion, under a policy such as is here before us, is that where a dangerous situation causing injury is one which arose out of or had its source in, the *use* or operation of the automobile, the chain of responsibility must be deemed to possess the requisite articulation with the *use* or operation until broken by the intervention of some event which has no direct or substantial relation to the *use* or operation,—which is to say, that the event which breaks the chain, and which, therefore, would exclude liability under the automobile policy, must be an event which bears no direct or substantial relation to the *use* or operation; and until an event of the latter nature transpires the liability under the policy exists.' "

*Ewing*, 235 Md. at 149–50, 200 A.2d at 682 (emphasis added) (quoting *Merchants Co.*, 187 Miss. at 301, 188 So. at 572). In the case *sub judice*, the shooting had no direct or substantial

relation to the use of the vehicle. The shooting broke the chain of use—even if the vehicle had been in the process of being used.

The *Ewing* Court held that the injuries caused by the second automobile arose out of the use of the first vehicle from which the claimant had been thrown. It pointed out that

"The fact that the insured vehicle was exerting no physical force upon the instrumentality which was the immediate cause of the injury, and was not itself in physical contact * * * is neither decisive of nor fatal to the plaintiff's claim of coverage. * * * It is sufficient that the *use* was 'connected with the accident or the creation of a condition that caused the accident * * *.' "

*Id.* at 150, 200 A.2d at 682 (emphasis added) (quoting *Carter v. Bergeron,* 102 N.H. 464, 471, 160 A.2d 348, 353 (1960)). The Court concluded by stating that "the negligent *use* of the car created a situation where [the passenger] was subjected to the risk of injury...." *Id.* at 150–51, 200 A.2d at 683 (emphasis added). Although the Court gave a somewhat broad interpretation to the language, it still required that there be a connection between the use of the vehicle and the injury that was created.[7] As the closing statement in *Ewing* provides, the "use" of the car must create the risk of injury. To allow recovery under the uninsured motorist coverage, when there is no connection between the "use" of the vehicle and the injury inflicted, would be to require insurance companies to provide coverage for any imaginable incident occurring near a vehicle. A result which is clearly beyond the scope of a statute which was enacted "to assure financial compensation to the innocent victims of motor vehicle accidents who are unable to recover from financially irresponsible uninsured motorists." *Johnson,* 388 Md. at 95, 878 A.2d at 622 (quotations omitted)

---

7. In the present case, not only was the gun the instrumentality of the injury, but the only vehicle present was not being used negligently at the time of the incident, and the vehicle itself was a properly insured vehicle standing still with the ignition off.

(quoting *Lane v. Nationwide Mut. Ins. Co.*, 321 Md. 165, 169, 582 A.2d 501, 503 (1990)).

In reference to the interpretation of the language "aris[ing] 'out of the ownership, maintenance, or use of a motor vehicle,'" respondent cites *Frazier v. Unsatisfied Claim and Judgment Fund Board*, 262 Md. 115, 117, 277 A.2d 57, 58 (1971) (a claim against the Unsatisfied Claim and Judgment Fund Board and not against a policy holder's insurance carrier). In that case, the driver of an unidentified vehicle threw a lit firecracker into the rear seat of the plaintiff's convertible. The plaintiff, distracted by the ensuing explosion, and the cries of her five-year-old child who was riding in the back seat, lost control of the vehicle and hit a tree.

The Court determined that in evaluating insurance policy coverage "whether an injury is or is not within the coverage provided by an automobile insurance policy may well turn on the question whether the *use* of an automobile is directly or merely incidentally causally connected with the injury, even though the automobile itself may not have proximately caused the injury." *Id.* at 118, 277 A.2d at 59 (emphasis added). The Court recognized the *Ewing* test under insurance policy law. It held, however, that for purposes of the then existing Unsatisfied Claim and Judgment Fund (the "Fund"), which required a liberal construction to protect innocent victims, "the injuries under the facts of [that] case did arise out of the ownership, operation or use of an unidentified motor vehicle." *Id.* at 119, 277 A.2d at 59. The Court did not provide any guidance as to the required relation between the injury and the vehicle, nor did it set any limits to its holding. But, what was very clear in *Frazier* was that the injured parties were actually riding, i.e., using, a vehicle at the time it ran off the road and struck a tree. The act that caused the crash was also committed from a moving, operating vehicle presumed to be uninsured. The uninsured vehicle was, therefore, being actually *used* as a car at the time the firecracker was thrown.

Respondent also relies on *Northern Assurance Co. of America v. EDP Floors*, Inc., 311 Md. 217, 533 A.2d 682 (1987), for

the proposition that only a "minimal 'arising out of' causal relation" between the injury and the use is required to entitle the insured to recover under the uninsured motorist provision of the policy. *Id.* at 232, 533 A.2d at 689. In *EDP*, the Court was called to interpret an exclusion clause on an general business insurance policy stating that: "Coverage does not apply to *bodily injury* or *property damage* arising out of the ownership, maintenance, operation, use, loading or unloading of ... [a vehicle]." *Id.* at 224–25, 533 A.2d at 686. The exclusion covered any vehicle owned by the insured or operated by an employee of the insured while in the course of employment. The Court reasoned that

"The words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like. *See Baca v. New Mexico State Highway Dept.*, 82 N.M. 689, 486 P.2d 625, 628 (1971); Webster's Third New International Dictionary 117 (1961). While these words plainly import a causal relation of some kind, read in context, they do not require that the unloading of the truck be the sole 'arising out of' cause of the injury; they require only that the injury arise out of the unloading of the vehicle."

*Id.* at 230, 533 A.2d at 689 (citation omitted). The Court has more recently expounded on this view stating:

"The insurance treatises support the view articulated in *EDP Floors* and in *Ewing* that the words 'arising out of' mean 'originating from, growing out of, flowing from, or the like.' *See, e.g.,* 6B J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 4317, at 360–63 (R.B. Buckley ed., 1979) (in the context of automobile insurance, the words 'arising out of' have 'broader significance than the words "caused by," and are ordinarily understood to mean originating from, incident to, or having connection with the *use* of the vehicle'); 12 G.J. Couch, *Couch Cyclopedia of Insurance Law* § 45:61, at 294 (2d ed. 1981) ('[T]he words "arising out of" ... generally mean "originating from," "growing out of," or "flowing from." '); 1 R.H. Long, *The Law of Liability Insurance* § 1.22, at 1–57 (1972) ('The

phrase "arising out of" is not to be construed to mean "proximately caused by." . . . The words "arising out of" mean causally connected with, not "proximately caused by" use.')."

*Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 315, 708 A.2d 298, 306 (1998) (emphasis added).

*EDP* involved a situation where two employees of the insured were delivering floor tiles to a job site in a truck. One of the employees was inebriated and as a result another person was helping the sober employee unload the floor tiles. At some point, the helper operated the truck's hydraulic lift and the floor tiles fell and injured him. EDP claimed that the exclusion clause only applied to vicarious liability for the negligence of its employees. It argued that because the incident did not occur due to the negligence of its employee, it did not arise out of the unloading of a vehicle as contemplated under the policy. The Court disagreed. In arriving at its conclusion, the *EDP* Court stated: "As we see it, the language in the exclusionary clause clearly focuses the 'arising out of' inquiry on the instrumentality of the injury, *i.e.*, upon the truck and its unloading." 311 Md. at 230, 533 A.2d at 689. In the case at bar, if we focus our inquiry on the instrumentality of the injury, it is the handgun and not the Blazer's use, as it was intended to be used, which resulted in Mr. DeHaan's injuries.

More recently in *Mass Transit Administration v. CSX Transportation, Inc.*, 349 Md. 299, 708 A.2d 298 (1998), we analyzed *Ewing, Frazier,* and *EDP* and their interpretation of the "arising out of" language. *CSX* was not a case involving an automobile liability insurance policy but related to the interpretation of an indemnification clause in a contract between Maryland's Mass Transit Administration (MTA) and CSX Transportation, Inc. (CSXT). That clause provided that the MTA would " 'indemnify, save harmless, and defend CSXT from any and all casualty losses, claims, suits, damages or liability of every kind *arising out of* the Contract Service under' [the agreement.]" *Id.* at 301, 708 A.2d at 300. CSXT's claim for indemnification resulted from an accident where a

backhoe being used by a CSXT contractor was destroyed by a MARC passenger train. The MTA claimed that the accident was the result of negligence prior to the accident. The Court determined, however, that the damage to the backhoe arose out of the accident.

The MTA argued that, according to *Ewing* and *Frazier*, "even if proximate causation is not required for 'arising out of' coverage, something more than 'but for' causation is required." *CSX*, 349 Md. at 316, 708 A.2d at 307. The Court rejected that proposition, pointing out that in *Ewing* the proximate cause requirement was simply rejected "without mentioning any need for some lesser fault;" and in *Frazier*, there was no mention of causation. *CSX*, 349 Md. at 316, 708 A.2d at 307. The Court in *CSX* determined that proximate cause was not required and that *Ewing* and *Frazier* did not support requiring more than "but for" causation in order to determine that the injuries "arose out of" the service contract. The present case differs from CSX in that we are dealing with an automobile liability insurance policy and the uninsured motorist provision of the statute. More specifically, we must interpret the *use* of the vehicle as it is the object of the "arising out of" clause in the insurance policy at issue.

Even in *CSX* the three dissenters pointed out that there should be more of a nexus between the injury and the contract service than simple "but for" causation. To require otherwise, the indemnification clause would require the MTA to indemnify CSXT "for a myriad of liabilities in no way closely related to the provision of commuter rail service by CSXT for MTA." *Id.* at 323, 708 A.2d at 310. In the same manner, the broad reading of the uninsured motorist statute suggested by respondent in the instant case, especially because the language of the specific provision requires that the vehicle be *used*, i.e., be the instrumentality of the injury resulting from an event rather than arising out of a contract, would be improper. It would require automobile liability insurance companies to cover a myriad of liabilities in no way related to the purpose of the statute, which, as stated previously, was "to assure financial compensation to the innocent victims of motor vehicle

accidents who are unable to recover from financially irresponsible uninsured motorists." *Johnson,* 388 Md. at 95, 878 A.2d at 622 (emphasis added) (quotations omitted) (quoting *Nationwide Mut. Ins. Co.,* 321 Md. at 169, 582 A.2d at 503).

State Farm points to a number of cases from the Court of Special Appeals in support of its position that the shooting did not arise out of the ownership, maintenance, or *use* of the vehicle. In *Webster v. Government Employees Insurance Co.,* 130 Md.App. 59, 744 A.2d 578 (1999), *cert. denied,* 358 Md. 610, 751 A.2d 472 (2000), three people were in an uninsured car when a man approached them, told them to get out of the vehicle and showed them a handgun. The driver accelerated in an attempt to get away. The assailant then fired his gun at the vehicle killing the passenger, a sixteen-year-old girl traveling in the back seat. The girl's parents sued their insurance company, Government Employees Insurance Co. (GEICO), under their policy's uninsured motorist provision. The Court of Special Appeals appropriately refused to accept the parents' argument that an attempted carjacking should be deemed as " 'arising out of the ownership, maintenance, or *use* of the uninsured motor vehicle.' " *Id.* at 64, 744 A.2d 578, 744 A.2d at 581 (emphasis added). The court came to the conclusion that

"In this case, there was only one car and one driver.... The Carjacker ... was neither physically inside nor in control of any vehicle. Furthermore, [the victim's] injuries were not causally connected to the *use* of an uninsured vehicle, but rather were caused by [the assailant's] assault. Therefore, injuries resulting from this attempted carjacking are not covered by the Maryland uninsured motorist provision."

*Id.* at 67, 744 A.2d at 582 (emphasis added). The intermediate appellate court implied that the injury needs to be at least causally connected to the normal use of the vehicle. The gunshot injuries were not the result of the *use* of the vehicle in *Webster,* nor were they in the case *sub judice.*

Respondent relies on two apposite Court of Special Appeals' cases to distinguish *Webster: McNeill v. Maryland Insurance*

*Guaranty Ass'n,* 48 Md.App. 411, 427 A.2d 1056, *cert. denied,* 290 Md. 718 (1981) and *Harris v. Nationwide,* 117 Md.App. 1, 699 A.2d 447, *cert. denied,* 348 Md. 206, 703 A.2d 148 (1997). The Court of Special Appeals, however, specifically addressed both opinions in *Webster,* stating:

> "[I]n *McNeill* . . ., the plaintiff was injured when his car battery exploded during an attempt to 'jump-start' his vehicle. The *driver* of the other vehicle, which was being *used* to help McNeill jump-start his car, lit a match while observing the plaintiff, causing the explosion. This Court held that McNeill's injuries were covered under the other automobile's insurance policy because the injury arose out of, or had its source in, the *use or operation of the automobile.*
>
> "In *Harris* . . ., the plaintiff, a pedestrian, was injured when an unidentified *driver* grabbed the plaintiff's purse and dragged her 15 feet before speeding away. This Court held that the insured pedestrian was covered under her uninsured motorist provision because the assault arose out of the ownership, maintenance, or *use* of the thief's vehicle."

*Webster,* 130 Md.App. at 66–67, 744 A.2d at 582 (citations omitted) (emphasis added) (footnote omitted). In both cases, using *Frazier's* language, the cars were directly causally connected to the injuries sustained. In *McNeill,* the vehicle was being used to jumpstart the injured driver's car. In *Harris,* the thief's vehicle was *itself* used to drag Ms. Harris, causing her injuries. The common thread in these two cases is the active participation of the vehicle of the perpetrator or tortfeasor.

The second Court of Special Appeals' case that State Farm relies on is *Wright v. Allstate Insurance Co.,* 128 Md.App. 694, 740 A.2d 50 (1999). In that case, Mr. and Mrs. Wright were stopped at a traffic light when a man named "PeeWee" Erskin Caldwell got out of his vehicle and shot both of them. Pee-Wee had attempted to shoot Mr. Wright in at least one other occasion, apparently because he believed Mr. Wright to be a police informant. The Wrights sought to recover for their injuries under their uninsured motorist coverage.

■ The Court of Special Appeals explained that "the Wrights were injured because PeeWee shot them, not because he was *using* a car. . . . We agree that the use of the car was incidental to the attempt to kill Wright. It was not directly, causally, connected to the incident." *Id.* at 698–99, 740 A.2d at 52 (emphasis added). The court went on to point out that:

> "Were we to hold otherwise, as Allstate points out, any victim of a crime whose assailant fled the scene of a crime in a car could seek recovery from his own insurer if he had a policy containing uninsured motorists coverage. Uninsured motorists coverage was never intended to cover the type of injuries presented by the facts of this case. The primary purpose of sec. 19–509 of the Insurance Article is to assure financial compensation to the innocent victims of motor vehicle accidents who are unable to recover from financially irresponsible uninsured motorists. *Pennsylvania National Mutual Casualty Ins. Co. v. Gartelman,* 288 Md. 151, 416 A.2d 734 (1980)."

*Id.* We agree with the Court of Special Appeals' interpretation. Allowing this type of claim would make insurance companies responsible for injuries the Legislature never contemplated as being covered under the statute.

*Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 753 A.2d 533 (2000), is not to the contrary, nor do the parties here contend otherwise. In *Cole,* the insured was covered under an accidental death and dismemberment provision in her husband's automobile liability policy. *Id.* at 302, 753 A.2d at 535. While secured by a seatbelt into the right front passenger seat of her husband's idling van in a residential driveway, Mrs. Cole was shot and killed by her husband's former father-in-law, after he shot Mr. Cole, who had exited the van to collect a child from his former marriage for a visit. *Id.* at 301, 753 A.2d at 535. In her panic at seeing the man approaching with a handgun, Ms. Cole was unable to extricate herself from her seatbelt and, thus, was unable to take evasive action either to drive the van away or evacuate the van. *Id.*

The accidental death provision in the Cole's policy supplied first party coverage for an insured who died or suffered a loss by "accident" while occupying, or was struck by, a motor vehicle. State Farm conceded that Mrs. Cole was occupying a covered vehicle when she was shot and killed. *Id.* at 306–07, 753 A.2d at 538. The definition of what constituted an "accident," for purposes of determining coverage under the accidental death provision, became the analytical focus of the Court's opinion, as the policy gave no definitional assistance in that regard. *Id.* at 307 n. 7, 753 A.2d at 538 n. 7.

The Court in *Cole* noted that accidental death and dismemberment coverage was "somewhat unusual" in automobile liability policies. *Id.* at 306, 753 A.2d at 537. Although Mr. Cole and his insurer contended that, pursuant to Maryland case law, an "accident" should be defined as "a happening; an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect from a known cause, and therefore not expected," this definition, for purposes of the facts of *Cole,* was incomplete because it failed to establish through whose eyes, the insured victim or the tortfeasor, the Court should view whether Mrs. Cole's death was a the result of an "accident." *Id.* at 307, 753 A.2d at 538 (citation omitted). Even under preexisting Maryland cases, "the fact that damages were caused by an intentional act did not preclude [a] finding that they were caused by 'accident' if something unforeseen produces an unexpected result." *Id.* at 308, 753 A.2d at 539, citing *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 150, 235 A.2d 556, 557 (1967); *see also Glens Falls Ins. Co. v. American Oil Co.,* 254 Md. 120, 127, 254 A.2d 658, 662 (1969), and *State Farm Mut. Ins. Co. v. Treas,* 254 Md. 615, 620, 255 A.2d 296, 298 (1969). After analyzing relevant Maryland, federal, and sister state cases, we concluded that: (a) the proper approach was to apply the definition of "accident" from the vantage point of the injured insured; and (b) that Mrs. Cole's death was the direct result of an "accident" because her shooting was an unusual and unforeseen event

when viewed from her perspective. *Id.* at 318, 753 A.2d at 544.

Because accidental death and dismemberment coverage is not mandated by statute in automobile liability policies in Maryland, unlike the uninsured motorist coverage that is involved in the present case, the analysis in *Cole* proceeded as one solely of interpreting a contract in accordance with established principles of the Maryland common law of contracts. In the present case, while many of the same common law principles figure somewhat in the Court's reasoning, the overarching consideration is one of legislative intent, an inquiry not undertaken or required in *Cole*. Moreover, the coverage terms requiring interpretation here, "use" of an automobile, are quite different than *Cole's* analysis of the definition of "accident."

In *Cole*, if the actions of the shooter and Mrs. Cole's frightened entrapment in the idling motor vehicle were an "accident," causation was conceded. In the present case, the causal relationship or connection between the known operative facts resulting in Mr. DeHaan being shot is the crux of the inquiry for an entirely different kind of coverage than was involved in *Cole*.

In the absence of any cases directly on point supporting his position from this Court, Mr. DeHaan points to *Carrigan v. State Farm Mutual Automobile Insurance Co.*, 326 Or. 97, 949 P.2d 705 (1997), for the proposition that injuries sustained in the course of a carjacking are covered under statutes that provide benefits "for injuries 'resulting from the use, occupancy, or maintenance of any motor vehicle....'" *Id.* at 99, 949 P.2d at 706. *Carrigan* was a PIP case not an uninsured motorist case. There, the driver agreed to give the assailant a ride. While they were driving, the man showed the driver a gun and directed him to a residential neighborhood. The assailant told the driver to stop and get out of the car. Both men got out, and a few minutes later the assailant shot the driver on the street. The Oregon court determined that the

injury arose out of the carjacking, which under its PIP statute it determined to be involved with the use of a vehicle.

The Oregon court explained that there were two possible interpretations of its PIP statute. Under one interpretation, the gunshot would have to be the direct consequence of the use of the vehicle. Such an interpretation would, according to the Oregon court, allow recovery from the injuries suffered as a result of a collision caused by a gunshot, or maybe even injuries resulting from the accidental discharge of a weapon caused by the vehicle, such as hitting a pothole. A second interpretation would permit coverage when the injury results from any use of the vehicle. Under such interpretation the injury in a carjacking would be covered because it is a result of the vehicle being the object of the carjacking. The Oregon court adopted the second interpretation of the statute in allowing the driver to recover PIP benefits.

Other courts, however, have not come to the same conclusion in cases specifically addressing uninsured motorist coverage, such as the coverage at issue in this case.[8] We find them more persuasive. In *Allstate Insurance Co. v. Skelton*, 675 So.2d 377 (Ala.1996), an insured driver was savagely beaten by an uninsured driver when coming to the aid of a third driver whom the uninsured driver was threatening with a pistol. The Supreme Court of Alabama held that the battery on the insured driver was an intervening act, which broke the causal connection between the *use* of the vehicle and the injuries; therefore, the injuries were not covered by the uninsured motorist clause on his policy. *Id.* at 380. In Arizona, the plaintiff must affirmatively show that the injuries were caused and produced by the uninsured vehicle. *Ruiz v. Farmers Ins. Co.*, 177 Ariz. 101, 103, 865 P.2d 762, 764 (1993) (holding that a passenger in an insured vehicle, who is shot by the passenger of an uninsured vehicle, was not covered under the uninsured motorist provision of her insurance policy because the injury did not arise out of the *use* of the uninsured vehicle); *Sprad-*

---

8. As indicated earlier, petitioner, paid the insured under the policy's PIP coverage.

*lin v. State Farm Mut. Auto. Ins. Co.,* 650 So.2d 1383 (Miss. 1995) (same); *Razizadeh v. State Farm Fire & Cas. Co.,* 251 Kan. 254, 833 P.2d 1007 (1992) (holding that the death of a driver did not arise out of the operation, maintenance, or *use* of a motor vehicle when he was shot in the conduct of a robbery where the assailant bumped the driver's car with his own automobile in order to lure him out, shoot and rob him); *Kessler v. Amica Mut. Ins. Co.,* 573 So.2d 476 (La.1991) (holding that the shooting of a motorist by an unidentified driver, while the shooter was driving and had run a stop sign, did not arise out of the ownership, maintenance, or *use* of the uninsured vehicle. The Louisiana Supreme Court stated that interpreting the word "use" as to encompass a shooting would be to improperly extend the meaning to the term "while using" a vehicle which it held was contrary to the plain and common-sense interpretation of its statute.); *Farm & City Ins. v. Estate of Davis,* 2001 SD 71, 629 N.W.2d 586 (2001) (holding that a drive-by shooting does not arise out of the *use* of a vehicle as contemplated by the uninsured motorist provision); *Mid–Century Ins. Co. of Tex. v. Lindsey,* 997 S.W.2d 153 (Tex.1999) (holding that while the intentional firing of a firearm, such as in a drive-by shooting, does not arise out of the *use* of a vehicle, the accidental discharge of a shotgun when a child is climbing onto the cab of the truck does arise out of the *use* of the truck as required by the uninsured motorist provision); *but see Wausau Underwriters Ins. Co. v. Howser,* 309 S.C. 269, 422 S.E.2d 106 (1992) (*per curiam*) (where, when answering certified questions from the Court of Appeals for the Fourth Circuit, the Supreme Court of South Carolina held that injuries from a gunshot fired from a moving uninsured vehicle arose out of the ownership, maintenance, or use of the uninsured vehicle.); *Cont'l W. Ins. Co. v. Klug,* 415 N.W.2d 876 (Minn.1987) (holding that a shooting from a moving vehicle arises out of the *use* of the vehicle because the shooter was using the vehicle for motoring purposes).

Recently, the Supreme Court of Iowa enunciated an illustrative standard. *American Family Mut. Ins. Co. v. Petersen,* 679 N.W.2d 571 (Iowa 2004). In that case, a woman jumped

from a moving vehicle while trying to escape an attack by her former boyfriend. The Supreme Court of Iowa upheld her uninsured motorist claim, but in doing so described the following standard in evaluating uninsured motorist coverage:

"From an analytical standpoint, we observe that the 'arising out of' phrase is tied directly to the phrase '*use* of the vehicle.' Nevertheless, these two phrases actually require separate inquiries. *See* [8A Lee R. Russ, *Couch on Insurance* § 119:37, at 119–57 (3d ed. 1995) ] ('[T]he concepts of use and legal cause should be analyzed separately, avoiding the traditional proximate cause concepts.'). This means the *use* of the vehicle at the time of the injury must not only be a contemplated *use* and inherent in the purpose and nature of vehicles, but the *use* must be causally related to the injury. *See Johnson v. State Farm Mut. Auto. Ins. Co.*, 190 W.Va. 526, 438 S.E.2d 869, 872–73 (1993) ('Use' 'must be foreseeably identifiable with the normal *use* of the vehicle' as a vehicle.); *see also Detroit Auto. Inter–Insurance Exch. v. Higginbotham*, 95 Mich.App. 213, 290 N.W.2d 414, 418–19 (Mich.Ct.App.1980). Like the 'arising out of' phrase, the term 'use' is broad, but not so broad as to embrace acts independent of the operation of a vehicle. *See* 1 *No Fault and Uninsured Motorist Automobile Insurance* § 9.10[2], at 9–20 to –22 (MB 2000). The vehicle must be more than the site of the tortious conduct."

*Id.* at 583 (emphasis added). In the Iowa case, the injuries were a result of a fall from a moving vehicle in which the victim was being carried away. Such use of the vehicle, i.e., carrying people, the Supreme Court of Iowa reasoned, was a contemplated use of an automobile and as such entitled the victim to uninsured motorist coverage. *See also Walsh v. Amica Mut. Ins. Co.*, 141 N.H. 374, 375, 685 A.2d 472, 473 (1996) (holding that "there must be more than a tenuous connection to the automobile; the operator must have been 'using his vehicle or behaving as a motorist' at the time the plaintiff was injured"). Applying that standard to the case *sub judice,* it is clear that firing of a handgun is not a

"contemplated use and inherent in the purpose and nature of vehicles."

Other courts apply a test similar to that enunciated in *Ewing, supra.* The Supreme Court of New Mexico, for example, has described the test, stating:

> "a court first considers whether there is a sufficient causal nexus between the use of the uninsured vehicle and the resulting harm. Such a causal nexus requires that the vehicle be an ' "active accessory" in causing the injury.' *[Continental W. Ins. Co. v.] Klug,* 415 N.W.2d [876,] 878 [(Minn.1987)] (quoting *Tlougan [v. Auto–Owners Ins. Co.],* 310 N.W.2d [116,] 117 [ (Minn.1981) ] ); *see also Cung La [v. State Farm Auto. Ins. Co.],* 830 P.2d [1007,] 1009 [(Colo. 1992)] (holding that recovery might be had if injury would not have been suffered but for assailant's use of the vehicle). If a court finds that there is a sufficient causal nexus, then it should next consider whether an act of independent significance broke the causal link between the use of the vehicle and the harm suffered. *Klug,* 415 N.W.2d at 878; *see Kish v. Central Nat'l Ins. Group of Omaha,* 67 Ohio St.2d 41, 21 O.O.3d 26, 424 N.E.2d 288, 294 (1981) (holding that intentional act of murder was intervening cause); *cf. United Servs. Auto. Ass'n v. Ledger,* 189 Cal.App.3d 779, 234 Cal. Rptr. 570, 572 (1987) (interpreting liability policy and holding that stabbing was intervening cause). Finally, the court must consider whether the 'use' to which the vehicle was put was a normal use of that vehicle. For example, transportation would be a normal use, whereas use of a parked car for a gun rest would not be. *See Klug,* 415 N.W.2d at 878."

*Britt v. Phoenix Indem. Ins. Co.,* 120 N.M. 813, 907 P.2d 994 (1995); *see also Mayer v. State Farm Mut. Ins. Co.,* 944 P.2d 288 (Okla.1997) (holding that the use of a rental truck as a car bomb in the Oklahoma City bombing of the Alfred P. Murrah Federal Building was not a "use" as contemplated under the uninsured motorist provision). Shooting people is likewise not the manner in which vehicles are normally used, or for which

they are designed, i.e., vehicles are not normally necessary for shooting people.[9]

▬ As these cases indicate, an uninsured motorist provision requires that there be a direct causal relationship between the injury and the actual use of the vehicle. We agree with those courts which have required such a connection, providing a reasonable interpretation of a statute meant to protect lawfully insured individuals from automobile accidents caused by financially irresponsible motorists.

## B. Interpretation of the Insurance Policy Language

▬ Mr. DeHaan's insurance policy includes the required uninsured motorist coverage under § 19–509. We have previously delineated the analysis of insurance policies:

"In *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995), we summarized the rules for interpretation of insurance policies that apply here. There we said:

'In Maryland, insurance policies, like other contracts, are construed as a whole to determine the parties' intentions. *Cheney v. Bell National Life [Ins. Co.]*, 315 Md. 761, 766–67, 556 A.2d 1135[, 1138] (1989). Words are given their 'customary, ordinary, and accepted meaning,' unless there is an indication that the parties intended to use the words in a technical sense. *Id., see also Chantel Associates v. [Mount] Vernon [Fire Ins. Co.]*, 338 Md. 131, 142, 656 A.2d 779[, 784] (1995). 'A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to the term.' *Bausch & Lomb [Inc.] v. Utica Mutual [Ins. Co.]*, 330 Md. 758, 779, 625 A.2d 1021[, 1031] (1993). If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous. *Collier v. MD–Individual Practice [Ass'n]*, 327 Md. 1, [6,] 607 A.2d 537[, 539] (1992); *Pacific Indem. [Co.] v. Interstate Fire & Cas. [Co.]*, 302 Md. 383, [389,] 488 A.2d 486[, 489]

---

9. Except perhaps military vehicles such as tanks, etc.

(1985). A term which is clear in one context may be ambiguous in another. *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 74, 517 A.2d 730[, 732] (1986); *Bentz v. Mutual Fire [, Marine & Inland Ins. Co. .]*, 83 Md.App. 524, 537, 575 A.2d 795[, 801] (1990).

. . .

*Id.* at 508–09, 667 A.2d at 619."

*Bushey v. Northern Assurance Co.*, 362 Md. 626, 631–32, 766 A.2d 598, 600–01 (2001). We will now evaluate the policy using these principles.

Mr. DeHaan's insurance policy tracks the statutory language set out in section 19–509 of the Insurance Article:

"We will pay damages for *bodily injury* and *property damage* an *insured* is legally entitled to collect from the owner or driver of an *uninsured motor vehicle.* The *bodily injury* must be sustained by an *insured.* The *bodily injury* or *property damage* must be caused by accident arising out of the operation, maintenance or **use of an *uninsured motor vehicle.***" [Bolding added for emphasis.]

As this language is identical to the statutory text, it is reasonable to infer that State Farm intended to give it the same meaning given to the statute. As explained previously we conclude that the injuries, even if deemed accidental from the point of view of Mr. DeHaan, did not arise out of the *use* of the motor vehicle as contemplated by the insurance policy, i.e., the contract between the parties.

## IV.  Conclusion

The uninsured motorist provision of the Maryland Code was enacted to protect innocent victims from irresponsible drivers who drive without insurance. This section is to be liberally construed to ensure that innocent victims of motor vehicle accidents can be compensated for the injuries they suffer as a result of such accidents. The Legislature, however, did not intend this provision to require insurance coverage against all criminal activity perpetrated in connection with a

vehicle. In order to come within the coverage of the statute there must be a nexus between the injury and an uninsured vehicle. Although, this nexus need not meet the proximate cause standard applicable to most tort cases, it must be more than merely incidental. The respondent's injuries do not have the required nexus to the use of the vehicle.

We shall interpret the insurance policy in light of the statute. The policy tracks the statutory language stating that coverage is provided for incidents "arising out of the ... *use* of an uninsured motor vehicle." § 19–509(c)(1) (emphasis added). We interpret the uninsured motorist provision's referral to *use* to require a nexus between the injury and the normal use of an uninsured vehicle. As with our interpretation of the statute, under the policy, respondent's injuries did not arise out of the normal use of an uninsured vehicle. We therefore reverse the decision of the Court of Special Appeals, which affirmed the circuit court's grant of motion for summary judgment in favor of respondent. Under the circumstances of this case, State Farm is entitled to judgment as a matter of law.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RE-SPONDENT.**